J.S31034/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.D., FATHER | : | No. 503 MDA 2020 |

Appeal from the Order Entered March 4, 2020,
in the Court of Common Pleas of Lycoming County
Juvenile Division at No. CP-41-DP-0000061-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.D., FATHER | : | No. 504 MDA 2020 |

Appeal from the Order Entered March 4, 2020,
in the Court of Common Pleas of Lycoming County
Juvenile Division at No. CP-41-DP-0000062-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.D., FATHER | : | No. 505 MDA 2020 |

Appeal from the Order Entered March 4, 2020,
in the Court of Common Pleas of Lycoming County
Juvenile Division at No. CP-41-DP-0000063-2018

BEFORE:  BOWES, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:  **FILED SEPTEMBER 04, 2020**

Appellant, K.D. ("Father"), appeals from the permanency review orders dated February 18, 2020, and entered on March 2, 2020, continuing the dependency of his three dependent, minor male sons with S.D. ("Mother") D.D.1 (born in June of 2012); D.D.2 (born in February of 2014); and D.D.3 (born in August of 2018) (collectively, the "Children"), and continuing the legal and physical custody of the Children in the Lycoming County Children and Youth Services ("CYS" or the "Agency"), with their placement in foster care under the Juvenile Act, 42 Pa.C.S.A. § 6302(1) and § 6351.  Additionally, in the permanency review orders, as well as in separate aggravated circumstances orders dated February 18, 2020 and entered on March 4, 2020, the trial court found aggravated circumstances against Father under the definition at 42 Pa.C.S.A. § 6302(5), which Father challenges.  We affirm.

The factual background and procedural history of this appeal is as follows.  On December 20, 2018, CYS filed motions for emergency protective custody with regard to the Children after it received a report that D.D.3, who was then four months old, was covered with scratches and bruises.  Mother was unable to provide a reasonable explanation for the injuries.  D.D.3 was admitted to Geisinger Hospital for an evaluation.  Mother stated to the CYS caseworker that her two older sons, D.D.1, age six, and D.D.2, age 4, were at Hoopla's Family Fun & Grill (a local family fun center) with a childcare provider.  When an Agency caseworker went to Mother's residence, however, she discovered that D.D.1 and D.D.2 were home alone.  D.D.1 and D.D.2 also were covered in scratches and bruises, and the conditions in the home were

deplorable. D.D.1 and D.D.2 were taken to Williamsport Hospital for evaluation. Mother stated that Father was working out of town, and that she has no family in the area to care for the Children. The trial court, the Honorable Judge Joy Reynolds McCoy, entered emergency custody order on December 20, 2018, and scheduled a shelter care hearing to occur the following day. On December 21, 2018, the trial court appointed conflict counsel, Julian Allatt, Esq., to represent Father. On that same date, CYS filed dependency petitions regarding the Children, and the trial court held the shelter care hearing. In orders dated December 21, 2018, and entered on December 24, 2018, the trial court found sufficient evidence to support a conclusion that the return of the Children to the home of their parents was not in the Children's best interests, and that the Children should remain in CYS's care and custody.

On January 8, 2019, the trial court appointed Trisha Hoover Jasper, Esq., to represent Father, and Attorney Allatt withdrew his representation. On February 19, 2019, CYS filed motions for a finding of aggravated circumstances against Mother as an indicated perpetrator of abuse of D.D.3 and for causing D.D.3 to have scratches, a broken femur, two broken ribs, and burns, and for a failing to provide D.D.3 with nutrition. In the motion relating to D.D.3, CYS also sought a finding of aggravated circumstances against Father for failing to provide D.D.3 with nutrition. In the motions relating to D.D.1 and D.D.2, CYS alleged that Mother had been indicated as the perpetrator of abuse causing them bruising, and of repeated failure to

supervise those children, but did not state any aggravated circumstances as to Father. On February 20, 2019, the trial court appointed Angela Lovecchio, Esq., as the guardian **ad litem** ("GAL") to represent the Children.

On February 27, 2019, the trial court held an evidentiary hearing on the dependency petitions and aggravated circumstances motions. At the commencement of the hearing on February 27, 2019, CYS's counsel, John Pietrovito, Esq., stated that the Agency was seeking a finding of aggravated circumstances with respect to each of the parents and with respect to each of the Children.[1] CYS presented the testimony of Emily A. Olmes, D.O.; Pat J. Bruno, M.D.; Patrick Ward, a Physician's Assistant; and Paul J. Bellino, M.D. Thereafter, on March 19, 2019, the trial court held a second day of the hearings, at which CYS presented the testimony of Corporal Joseph Akers, a criminal investigator with the Pennsylvania State Police; and Melissa Hume and Jordan McGill, caseworkers with CYS. Father testified on his own behalf, and the GAL presented Mother's testimony.

Significantly, the following exchange took place between Judge McCoy and the GAL at the conclusion of the hearing on March 19, 2019:

> MS. LOVECCHIO: . . . I don't think reasonable efforts should be made. I think the parents need to – we

---

[1] Also on February 27, 2019, CYS filed amended motions for findings of aggravated circumstances as to both parents with regard to D.D.1 and D.D.2 alleging the same aggravated circumstances for Mother, and alleging that Father was indicated as a perpetrator of abuse on D.D.3, the sibling of D.D.1 and D.D.2.

need to see what's going on. I've never seen anything – I've never seen children in that state. Never seen it. That was horrendous. And it's very difficult for me to believe that [Father] just knew nothing about any of this. Nothing. Nothing. I – I don't understand that.

And, you know, he had to have seen at least – [Mother] was this depressed—that's the only thing I can attribute this to is severe post-partum depression, he didn't see that? And he just – he just washed himself. He just went. I have to work, I have to work, I have to work. I have to buy things. I have to buy things. No. Your Honor, I think it's very strange too that after these children have gone through what they've gone through that he wouldn't have immediately found another job to come back here and be with them.

The trauma that these children suffered, I wonder what's going to happen to them when they get older. This is severe, severe trauma. So I don't believe any reasonable efforts should be made. I think the parents – let's see what happens now. That's what I believe. I don't think they should be helped.

THE COURT: Okay, let me ask you, in regards to Father, what do you believe is the basis for me to find – because I would have to find that he caused serious bodily injury for aggravated physical neglect.

MS. LOVECCHIO: Okay, my thoughts are if this child – he knew that this child had problems gaining weight. He knew this and yet – I just want to come to this point. He goes – this baby since January 3rd [, 2018] gains two and a half pounds in 14 days because when you feed children that what happens, they grow. And he didn't see this? He didn't call the doctor? He didn't – he's having all kinds of trouble with [Mother]. No, I – we're – they were not having a good relationship. This is a serious, serious relationship between the two of them and he doesn't find out? Just because he fed

him some bottles while he was there and he sees the child is 4-months-old [sic] and weighs nine pounds?

I'm sorry. I don't think you can just say, I'm going to say, nope, don't know. Don't know. That's serious bodily injury. What does that do to a child when they don't – when they're not feeding properly in the first few months, in the formative months of their lives. That's gotta do something. It's got to be traumatic. I mean that's when their brains are forming and they're being basically – he called cachectic, malnourished. That's what the doctor [Emily A. Olmes, D.O.,] said. I don't know how that's not aggravated, aggravated, serous – or bodily injury. Serious bodily injury.

THE COURT: Okay. All right, I'll issue this Order.

Notes of testimony, 3/19/19 at 133-135.

On March 25, 2019, Judge McCoy entered Orders of Adjudication and Disposition, dated March 19, 2019, adjudicating the Children dependent pursuant to 42 Pa.C.S.A. § 6302(1) "Dependent child."[2] Also on March 25, 2019, the trial court entered separate orders dated March 19, 2019, finding

---

[2] Section 6302 of the Juvenile Act defines a "dependent child" as:

[a] child who:

(1)  is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

clear and convincing evidence to establish that the alleged aggravated circumstances existed as to both Mother and Father. Judge McCoy also entered separate Orders, in which she discussed her findings with regard to the Children. Judge McCoy found that Mother had caused serious bodily injury to the Children, as well as aggravated physical neglect, and that Father had caused aggravated physical neglect. Notably, Judge McCoy indicated that, although she had a suspicion that Father might have caused serious bodily injury, she did not believe such conduct had been proven at the hearings. (Orders, 3/25/19 at 3 (unpaginated).) Judge McCoy stated:

> AND NOW, this 19th day of March, 2019, at a time set for a dependency hearing, the [trial court] hereby adjudicates all three children dependent. The [C]hildren shall remain in the legal and physical custody of the Agency for continued placement in an approved resource home. The Family Service Plan and Child Permanency Plan dated December 20, 2018 to June 20, 2019 are hereby approved.
>
> By way of background, [Father and Mother] are the parents of [the Children]. The parents resided together in a home in Montgomery, Pennsylvania. Father worked for the gas industry and worked approximately two weeks on with one week off. Mother is the primary caregiver of the [C]hildren and Father would spend time with the [C]hildren when he was home on his days off.
>
> On December 11, 2018 [D.D.3] was at a doctor's appointment where there were concerns regarding his weight gain and it was noted that he had approximately two scratches on him. On December 20, 2019[, D.D.3] was brought back for a follow up appointment. At that time there were still considerable issues regarding his ability to gain weight, and, ultimately, [D.D.3] was transported to

Geisinger Medical Center from the Geisinger Clinic in Montoursville for hospitalization. At that time Children and Youth was contacted, as well as Children and Youth ultimately contacting the State Police. Children and Youth reported to the home where they discovered the older children, [D.D.1 and D.D.2], to be home alone.

The [trial court] heard testimony from four separate medical professionals including Dr. Olmes, Dr. Bruno, Patrick Ward, a Physician's Assistant, and Dr. Paul J. Bellino, M.D. These physicians saw all three or at least some of the [C]hildren during this timeframe.

In regard to [D.D.3], it was described that the pictures that were presented to the [trial court] were consistent with a child that had been battered. One physician noted that there were so many marks that he did not do his usual catalog of injuries of each one as it would have been in the hundreds. He noted that the pictures described the injuries better than he could. He also noted a bite mark on [D.D.3]. He noted that the marks on [D.D.3] literally covered every body surface that he had. It was also ultimately discovered that he had two healing rib fractures which would have occurred sometime around Thanksgiving and two chip fractures at the bottom end of his femur that is seen almost exclusively with child abuse.

[D.D.1] was described as being battered and having too numerous to count bruises all over his body. He had unusual scars that were approximately six to eight inches long which were attributable to the use of some type of a flexible cord. He was described as having bruises in areas that you don't normally see from an accident. He also was described as having poor hygiene on his feet. Patrick Ward, the Physician[']s Assistant, indicated that the injuries [D.D.1] sustained would have been painful. [D.D.1] described that his [m]other had hit him with a telephone and when asked how many times[,] he put his head down and raised all 10 fingers. [D.D.1] also made statements that his [f]ather had made his lip bleed.

[D.D.2] showed signs of bruises on his left temple. He had numerous scratches, bruises and marks over his entire body. It was described that the amount and number of bruises was to the extreme. He also had a fingerprint noted in the middle of his back.

When Children and Youth and the State Police reported to the home on December 20th[, 2018,] the home was found to be in extremely deplorable conditions. There were mice droppings everywhere throughout the house and a dead mouse noted. Mice were scurrying across the room when a door was opened. There was clothing and garbage throughout the house. Corporal Akers noted a rotted bag of potatoes that had come to the point that it was liquefied. The conditions of the home were clearly not in a state for the safety of any children being in the home, let alone a 4-year-old and 6½-year-old being left in a home alone.

It is noted that had there have been [sic] one indicated report filed in regard to Father in regards to [D.D.3's] failure to thrive. There are have been [sic] four indicated reports against Mother encompassing nine allegations in regards to [D.D.3], including scratching, a broke [sic] femur, burning between the toes, failure to thrive, and broken ribs. In the regards [sic] to [D.D.2], beating and repeated or prolonged egregious failure to supervise [sic]. In regards [sic] to D.D.1, beating and repeated or prolonged egregious failure to supervise [sic].

*The [trial court] notes that the abuse that's been afflicted [sic] upon these three young children is the worst that [the trial court] has ever seen. There is no explanation for the fact that they were physically abused by their parents. The [trial court] finds that though Father was away from the home more than he was present, he still has an obligation and duty to provide care for his children and that in light of the knowledge he had of the failure of [D.D.3] to gain weight that [sic] he had an affirmative duty to ensure that he was getting the proper nutrition. The [trial*

> *court] also finds it very hard to believe, based on the pictures that were presented to this [c]ourt which shows [sic] a snapshot of the [C]hildren in the home on December 20th[, 2018], that these conditions miraculously happened between Father's last time in the home on November 28th[, 2018] up until December 20th[, 2018].  The [trial court] strongly feels that Father, though maybe not to the extent that it was on December 20th[, 2018], was aware of the on goings [sic] in his home.*
>
> *At this time the [trial court] does find aggravated circumstances in regard to both parents.  The [trial court] specifically finds that Mother has caused serious bodily injury to the [C]hildren, as well as aggravated physical neglect.  In regard to Father, though the [trial court] has suspicion that Father may have caused serious bodily injury, the [trial court] does not believe it has been proven at this point, but the [trial court] does find that Father did cause aggravated physical neglect to the [C]hildren.  The [trial court] will not order efforts to reunify by the agency in regards to either parent.*

Trial court orders, 3/25/19 at unpaginated 1-3 (italics added).

Subsequently, the trial court held a series of permanency review hearings and entered a corresponding permanency review orders: on April 26, 2019, dated April 18, 2019; and on July 31, 2019, dated July 16, 2019.[3]  On June 5, 2019, Mother filed her appearance **pro se**.  On November 6, 2019, following a permanency review hearing held on October 17, 2019, the trial court entered permanency review orders dated October 17, 2019.

In the meantime, on October 8, 2019, CYS received three Child Protective Services ("CPS") reports, one for each of the Children, based on

---

[3] On August 5, 2019, the trial court amended its July 16, 2019 orders to reflect that the change of goal to adoption was withdrawn and not approved by the court.

- 10 -

information gleaned from the October 3, 2019 interviews of D.D.1 and D.D.2. conducted by Denise Feger, Ph.D., a psychologist. (Notes of testimony, 2/18/20 at 8-9, 20-22.) The CPS reports alleged that the Children had been physically abused, that each was a victim, and that Father was a perpetrator by omission for failing to protect them. (*Id.* at 8-9.) After the conclusion of the CYS assessment, all three reports were indicated for abuse on November 22, 2019. (*Id.* at 11.)

On December 6, 2019, CYS filed motions for a finding of aggravated circumstances against Father. On January 26, 2020, CYS filed petitions for a permanency review hearing. On February 18, 2020, the trial court, the Honorable Ryan M. Tira, held an evidentiary hearing on the permanency review petitions and the motions for a finding of aggravated circumstances.

At the hearing, CYS presented the testimony of its assessment caseworker, Jordan McGill. (Notes of testimony, 2/18/20 at 7-8.) CYS then presented the testimony of the Children's foster mother, J.N., who has cared for D.D.1 and D.D.2 since December 23, 2018, and for D.D.3 since December 24, 2018. (*Id.* at 22-23.) Next, CYS presented the testimony of its ongoing caseworker, Ashley Myers. (*Id.* at 32.)

Father then presented the testimony of Corey Burkholder, who is the Outreach caseworker with the Lycoming County Joinder Board, and has worked with Father since June 10, 2019 on anger management issues and assertiveness training. (*Id.* at 63-64.) Next, Father presented the testimony of William Pearson, the CYS Outreach visitation coordinator. (*Id.* at 69-70.)

Father then testified on his own behalf. (*Id.* at 80.) Finally, the GAL presented the testimony of Mother. (*Id.* at 94.)

On direct examination, Ms. McGill testified that she has been involved with the case and the Children since it began in December of 2018. (Notes of testimony, 2/18/20 at 7-8.) Ms. McGill testified concerning the CPS reports that CYS had received on October 8, 2019, alleging that the Children were victims of physical abuse, and that Father was a perpetrator by omission for failing to protect them. (*Id.* at 8-9.) Ms. McGill stated that the three reports were indicated for abuse on November 22, 2019, and were the basis for the motions for aggravated circumstances. (*Id.* at 11.) Ms. McGill explained that the information that was the basis of the CPS reports was derived from the evaluations of D.D.1 and D.D.2 by Dr. Feger. (*Id.* at 9.) Ms. McGill testified that typically CYS interviews alleged child victims, but Dr. Feger believed that such an additional forensic interview with the Children would be detrimental to them. (*Id.* at 9). Accordingly, Dr. Feger conducted interviews of the Children and obtained the facts from them that formed the basis of CYS's new set of aggravated circumstances motions. (*Id.* at 10.) Ms. McGill stated that CYS also interviewed Father and Mother, and, on November 22, 2019, concluded that the CPS reports were indicated. (*Id.* at 11-12.)

Further, Ms. McGill testified that CYS had received an additional CPS report on January 14, 2020, alleging that Father was a perpetrator of abuse on D.D.1. (*Id.* at 12.) The report alleged that Father had been hitting and punching D.D.1, and a separate second allegation that Father had created

a reasonable likelihood of bodily injury to D.D.1. (*Id.* at 12-13.) Ms. McGill testified that the investigation had been concluded on February 14, 2020. (*Id.* at 13, 16.)

On cross-examination by Father's counsel, Ms. McGill testified that the conclusion of the investigation of the most recent CPS report was indicated for abuse, but it was not part of the matter before the court. (*Id.* at 14.) On cross-examination by Mother's counsel, Ms. McGill testified that, in October of 2019, Dr. Feger had advised CYS that it would not be in the best interests of the Children at that time for CYS to interview them. (*Id.*) She stated that Dr. Feger had approved Ms. McGill's interview of D.D.1 with regard to the January 14, 2020 CPS report, and Ms. McGill had interviewed D.D.1. (*Id.* at 15.) In response to cross-examination by the GAL, Ms. McGill explained that the CPS reports filed on October 8, 2019, related to all of the original reports from December 18, 2018, and the injuries that the Children had sustained, alleging that Father knew about the abuse and/or did not stop it, which was new information not previously available to CYS. (*Id.*) Ms. McGill testified that the January 14, 2020, CPS report alleged that Father threw D.D.1 into the swimming pool in the backyard of the family home, although D.D.1 could not swim, and Father did not help him get out. (*Id.* at 16.) The report contained an allegation of a second incident where D.D.1 had gotten into trouble, and Father hit him in the mouth with a wooden spoon and made his mouth bleed. (*Id.*)

On re-direct examination by CYS, Ms. McGill testified that Father did not wish to be interviewed by CYS with regard to the January 14, 2020 CPS report, and advised CYS that, after consulting with his counsel, his statement would not change. (*Id.*) On re-cross-examination by Father's counsel, Ms. McGill testified that Father's statement in the past had been that he did not know about the abuse. (*Id.* at 17.) In the past, Father had shown CYS his work schedules demonstrating that he worked a substantial number of hours during the time period when the abuse allegedly occurred, and that he worked out of town much of the time. (*Id.*) Father was last in the family home for five to seven days around Thanksgiving of 2018, and, subsequently, was outside of Pennsylvania for a few weeks. (*Id.* at 18.) On re-cross examination by Mother's counsel, Ms. McGill testified that Mother did not respond to the notice of the report by requesting an opportunity to be interviewed regarding the January 14, 2020 CPS report, nor did CYS extend her an opportunity to be interviewed about it. (*Id.*) In response to re-cross-examination by the GAL, Ms. McGill testified that she recalled medical testimony from the prior hearings that D.D.3's broken ribs could have occurred during the time that Father was home during Thanksgiving of 2018. (*Id.* at 18-19.)

The trial court admitted into evidence Dr. Feger's individual evaluations of Mother and Father, performed on September 26, 2019 (*id.* at 20-22; CYS Exhibit ("Ex.") 15 and 18, respectively); and her evaluations of D.D.1 and D.D.2 performed on October 3, 2019 (notes of testimony, 2/18/20 at 20-22; CYS Ex. 16 and CYS Ex. 17, respectively).

Relevant to the aggravated circumstances determination on appeal, Ms. Myers, the ongoing CYS caseworker, testified that when the case commenced, Father resided in Montgomery, Lycoming County, but he subsequently moved to western Pennsylvania for his full-time employment. (*Id.* at 33-34.)  She stated that Father lives with his paramour, B.B., in Bridgeville, Pennsylvania, in Washington County, and that he travels to the visits with the Children for a three-hour weekly visit in Lycoming County.  (*Id.* at 33-35.)  She testified that Father has supervised, in-person, one-on-one visits with the Children once a week, and that he has video chats with the Children once a week.  (*Id.* at 35-37.)  Ms. Myers testified that Father had attended D.D.3's surgery on January 21, 2020, but that he had called her that same day to cancel his visit scheduled for January 23, 2020, because he was sick, but stated he would visit via Skype.  (*Id.* at 36-37.)  Ms. Myers also testified that Father was aware of an Individualized Education Program ("IEP") phone meeting in which he was scheduled to participate on November 4, 2019, concerning D.D.1's school, but she and the school principal were both unable to reach Father during the meeting.  (*Id.* at 40.)

Mr. Burkholder testified that Father had completed the anger management training using a curriculum for assertiveness training, and an active parenting course tailored to his court-ordered obligations, but Father had found the reading material overwhelming.  (Notes of testimony, 2/18/20 at 64.)  He stated that Father had worked actively on his goals.  (*Id.* at 64-65.)

Mr. Pearson, the CYS Outreach visitation coordinator for Father, testified that he has observed the majority of Father's visits with the Children. (*Id.* at 69-70.) Mr. Pearson testified that Father has a high rate of attendance at visits, and that, for the visits, Father travels to Lycoming County from the Pittsburgh area at least once a week, and sometimes more frequently. (*Id.* at 70.) Mr. Pearson stated that Father does well with the foster mother and with providing the Children the resources that they might need, in helping with their homework and bathroom issues, and also in helping with emotional issues. (*Id.* at 71-72.) Mr. Pearson was concerned with assisting Father in continuing to grow and change, and to be able to address the Children's energy levels during the three-hour visits. (*Id.* at 76.)

On direct examination, Father testified that he resides with his paramour, B.B., in Bridgeville, Pennsylvania, and that he works full-time for a tire business, 7 a.m. to 4 p.m., Monday through Friday, and 7 a.m. to 11 a.m. on Saturday. (Notes of testimony, 2/18/20 at 80-81.) Father stated that he has regularly visited the Children since they were placed in foster care in December of 2018. (*Id.* at 81). Father testified that he had missed a visit with D.D.3 on a Thursday, after the child's medical appointment on a Tuesday that same week, because he had taken time to be with D.D.3 on Tuesday, which was not on his routine day off, and he was sick himself. (*Id.* at 81-84.) Father stated that he visits the Children via Skype once each week. (*Id.* at 84-85.) Father also testified that he missed an IEP phone meeting because he was extremely busy at work, and that he had attempted to return the call

later in the day, but no one answered the phone. (*Id.* at 85-86.) Father stated that he had enrolled in a Batterer's Intervention Program pursuant to the trial court's October 17, 2019 order. (*Id.* at 86-87.) Father also testified that he had undergone a drug and alcohol evaluation, and was advised that he seemed to be "doing a very good job of keeping sober." (*Id.* at 87.)

Father stated that he is a very good father and he would never harm the Children. (*Id.* at 88.) Father testified that he planned to return a phone call from Dr. Feger and to do everything he could for the return of the Children to home and to him. (*Id.*) On cross-examination by CYS, Father testified that he had canceled the January 23, 2020 visit with D.D.3 two days in advance because he was sick himself, and that he had missed the phone call regarding the IEP because he was waiting for another call. (*Id.* at 89-90.) Father stated that B.B. or a friend usually transported him to the visits in Williamsport. (*Id.* at 90.) Father confirmed Mr. Burkholder's testimony that he had found the parenting workbook overwhelming, so he had ceased working on it. (*Id.*) On cross-examination by the GAL, Father confirmed that he remains married to Mother, but a divorce is in progress, and that, although he referred to B.B. as his spouse in his testimony, he is not married to B.B. (*Id.* at 93.)

On direct examination by the GAL, Mother testified that she had seen the photographs of the Children with the bruises that commenced the dependency proceedings. (*Id.* at 96.) She stated that Father had seen the Children with the bruises in the family home because he had regularly seen

the Children in the home and that he had done nothing. (*Id.* at 96, 100). Mother testified that Father was rough with the Children at times, but she stated that she could not say that he caused the bruises on the Children. (*Id.* at 96.) Mother also stated that Father sometimes spanked the "boys." (*Id.*) Mother testified that she had to get between Father and D.D.1 at times because she did not know what was going on, when Father was chasing D.D.1 from the garage and into the house. (*Id.* at 96-97.) Mother indicated that Father would have spanked D.D.1's buttocks, but she was not sure whether he would have spanked the child in such a manner as to cause bruising. (*Id.* at 97-98.) Mother testified that there was domestic violence between Father and her. (*Id.* at 98.) She stated that Father had broken her finger such that it required surgery, and that she no longer has full use of it. (*Id.*) Mother stated that she could only do what Father allowed. (*Id.* at 99-100.) Mother testified that she had agreed with Father that she would homeschool the Children so that he could work out of town, and that she could homeschool them in a hotel room. (*Id.* at 100-101.) Mother testified that she did not know about D.D.3's fractured ribs and broken femur until she was arrested, and that she did not know how D.D.3's injuries happened. (*Id.* at 100-101.) Mother also stated that she did not know that D.D.3 was not gaining weight or what caused his bruises. (*Id.* at 101.) Mother testified that Father was a "1950s dad," and that she did all of the parenting, although Father would engage in activities, such as baseball, with "the boys" when he was at home. (*Id.* at 100). Mother stated that Father can be different from the man he was

in his testimony, which is the one with whom she fell in love and married, and that he can be a different person. (*Id.* at 103.)

On cross-examination by CYS, Mother testified that she had seen Father hit D.D.1 with the handle of a small, metal "Swiffer" duster. (*Id.* at 104.) On re-direct examination by the GAL, Mother testified that she had walked in on the situation after Father had hit D.D.1 on his back with the duster handle, and that she did not observe any bruises, because it had just happened. (*Id.* at 106-107.) She observed D.D.1 was crying. (*Id.* at 106.) The incident occurred in August of 2018, after the birth of D.D.3. (*Id.* at 107.)

At the close of the testimony, the GAL, Attorney Lovecchio was in agreement with CYS's request for a finding of abuse with regard to Father as a perpetrator by omission. (Notes of testimony, 2/18/20 at 11.) Attorney Lovecchio stated that Mother testified Father had seen the bruises on the Children while he was in the family home which were depicted in the photographs, and he had done nothing. (*Id.*) Attorney Lovecchio reasoned that, based on Mother's testimony, the court could make a finding that Father was a perpetrator by omission. (*Id.*) She did not believe it would be in the best interests of the Children for Father to be reunified with the Children or for him to have unsupervised or extended home visits until he was truthful with the court concerning what had happened to the Children that had caused their bruises. (*Id.*)

On March 2, 2020, Judge Tira entered permanency review orders dated February 18, 2020, finding that, although Father had made moderate

compliance with the permanency plan, the placement of the Children remains necessary and appropriate, continuing the Children in dependency, and continuing legal and physical custody in CYS, with the Children placed in foster care. The permanency orders also found that the Agency did make reasonable efforts to prevent or eliminate the need for the removal of the Children from the home. Moreover, the orders found aggravated circumstances existed based on Father's failure to report the abuse of the Children, and found Father was a perpetrator of the abuse by omission. The permanency review orders provided that the prior orders remain in full force and effect.

On March 4, 2020, Judge Tira entered separate aggravated circumstances orders dated February 18, 2020 on the trial court's docket at the same trial court docket number as the permanency review orders.[4] In the aggravated circumstances orders, the trial court found clear and convincing evidence had been presented to establish the alleged aggravating circumstances as to Father.

---

[4] The trial court docket in the record reflects that, on March 6, 2020, CYS filed petitions for a change of goal. Further, the trial court's aggravated circumstances orders and the notes of testimony from the hearing indicate that petitions to terminate both Father's and Mother's parental rights were pending before the trial court. (**See** notes of testimony, 2/18/20 at 5.) The trial court scheduled the termination hearings to be held on March 25, 2020. (**Id.**) Moreover, the trial court stated that it would appoint legal interest counsel to represent the Children at the termination hearing, in addition to the GAL, with which both the GAL and CYS were in agreement. (**Id.** at 5-6.) There is no ruling on any of these petitions presently before this court for our review.

On March 13, 2020, Father timely filed three notices of appeal, along with concise statements pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this court, acting *sua sponte*, consolidated on April 24, 2020.

In his brief on appeal, Father raises the following issues:

1.      Whether the court erred in making a finding of abuse as a perpetrator by omission as defined at 23 Pa.C.S.[A.] § 6303 against Appellant as there is no evidence he was present when harm was caused to the [C]hild(ren).

2.      Whether the court erred in making a finding of abuse as a perpetrator by omission as defined at 23 Pa.C.S.[A.] § 6303 against Appellant as there was no evidence he observed or was aware of any harm being done to the [C]hild(ren).

3.      Whether the court erred in granting the Agency's motion for a finding of aggravated circumstances as it pertains to Appellant as there is no evidence [Father] was present when injuries occurred or was aware of the injuries to the [C]hild(ren).

Father's brief at 7.

Our standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.  Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

Initially, in its brief on appeal, CYS re-raises issues from its motions to quash Father's appeals, which we denied without prejudice. We will first address CYS's issue concerning whether Father filed the proper number of appeals. Our Supreme Court's decision in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), requires an appellant to file a separate notice of appeal for each trial court docket number he or she intends to appeal. CYS argues that we should dismiss Father's appeal because the trial court entered two separate orders per child, a permanency review order and an aggravated circumstances order, and Father filed only one appeal per child.

Addressing the orders that Father intended to appeal, in each of the three notices of appeal, Father stated that he was appealing from "the Permanency Review Order and Finding of Aggravating Circumstances and Abuse entered in this matter on the 18th day of February, 2020 by the Honorable Ryan M. Tira. A copy of the docket entry showing the entry of the order appealed from is attached to this Notice." The trial court docket entries attached to the notices of appeal reflect the entry of both the permanency review orders and the aggravated circumstances orders, however. As both the permanency review orders and the aggravated circumstances orders were dated February 18, 2020, and none of the orders was entered on February 18, 2020, we cannot discern Father's intent from the statement on the face of his notices of appeal.

In response to this court's docketing statements pursuant to Pa.R.A.P. 3517, Father attached only the aggravated circumstances orders, and not the February 18, 2020 permanency review orders. The three issues that Father raised in his concise statement and in his brief on appeal all relate to the finding of aggravated circumstances against him, which leads us to conclude that Father intended to appeal the aggravated circumstances orders. Additionally, there was only one trial court docket number listed on both the permanency review orders and the aggravated circumstances orders. Accordingly, we find that Father did not violate the Supreme Court's ruling in *Walker* by filing only one notice of appeal with respect to each of the Children where he intended to challenge only the aggravated circumstances order in each matter, and there was only one trial court docket number assigned in each child's case. *See Commonwealth v. Jerome Johnson*, 2020 WL 3869723 (Pa.Super. July 9, 2020) (*en banc*) (holding that the appellant's filing the correct number of notices of appeal to match the number of trial court cases, but listing all of the docket numbers on each notice of appeal and italicizing the relevant trial court docket number does not run afoul of *Walker* (overruling *Commonwealth v. Creese* 216 A.3d 1142 (Pa.Super. 2019),[5] to the extent it holds that it would run afoul of *Walker*). *See also*

---

[5] The *Creese* panel construed *Walker* to mean that "we may not accept a notice of appeal listing multiple docket numbers, even if those notices are included in the records of each case." *Creese*, 216 A.3d at 1144. Instead, the panel concluded "a notice of appeal may contain **only one** docket number." *Id.* (emphasis added).

*Commonwealth v. Larkin*, 2020 WL 3869710 (Pa.Super. July 9, 2020) (*en banc*) (holding that, where a *pro se* appellant filed one notice of appeal listing both of the trial court criminal docket numbers, and included an original and five copies of the notice appeal, under the panel decision in *Commonwealth v. Stansbury*, 219 A.3d 157 (Pa.Super. 2019),[6] which the *en banc* court in *Larkin* reaffirmed, there was a breakdown in court operations because the trial court directed the appellant to file "a notice of appeal").

Even if we were to conclude that Father intended to appeal the February 18, 2020 permanency review orders with respect to each of the Children, and not the aggravated circumstances orders, we would find that *Walker* would not preclude our review, as the trial court placed its finding that aggravated circumstances exist as to Father in each of the permanency review orders, rendering the filing of separate appeals from the aggravated circumstances orders unnecessary and duplicative.

---

[6] In *Stansbury*, this court noted that we have many times declined to quash an appeal when the defect resulted from an appellant's acting in accordance with misinformation that the trial court relayed to him. *Id.* at 159-160. In *Stansbury*, the panel stated that, while *Walker* required the appellant, Stansbury, to file separate notices of appeal at each docket number, the Post Conviction Relief Act court informed him that he could pursue appellate review by filing a single notice of appeal. The panel concluded that such misstatements as to the manner that Stansbury could effectuate an appeal from the PCRA court's order amounted to a breakdown in court operations such that we could overlook the defective nature of his timely notice of appeal. Therefore, the panel declined to quash the appeal pursuant to *Walker*, and addressed the substance of his appeal.

Next, we address CYS's challenge to the finality of the orders on appeal, raised in its motion to quash which we denied without prejudice, so we may determine whether we have jurisdiction over the appeals.  CYS contends that the orders that Father appealed are not final but interlocutory, and are not appealable as of right.

It is well settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute."  ***Stewart v. Foxworth***, 65 A.3d 468, 471 (Pa.Super. 2013); ***see also In the Interest of J.M.***, 219 A.3d 645, 650 (Pa.Super. 2019).  Generally, a final order is one that disposes of all claims and all parties.  ***See*** Pa.R.A.P. 341(b).  However, in the context of dependency, we have stated:

> "[D]ue to dependency's unique nature, the fact that further proceedings are contemplated is not dispositive of the finality of the order.  ***In the Interest of J.L.***, 216 A.3d 233, 2019 WL 3295100, at 3 n.1 (Pa. Super. 2019).  In the dependency context, the court "must examine the practical consequences of the order to determine if the party challenging it has effectively been put out of court." ***In re Interest of M.B.***, 388 Pa. Super. 381, 565 A.2d 804, 806 (1989).

***J.M.***, 219 A.3d at 652.  We continued, stating:

> Based upon the two-step procedure contemplated by the Juvenile Act for declaring a child dependent (***i.e.***, an adjudication followed by a disposition, ***see*** 42 Pa.C.S.[A.] 6341(c)), this Court has held that it is the dispositional order following a dependency adjudication that is a final appealable order.  ***In the Interest of C.A.M.***, 264 Pa.Super. 300, 399 A.2d 786 (1979).

- 25 -

***J.M.***, 219 A.3d at 651-652.

Here, as the trial court orders on appeal (either the aggravated circumstances orders or the permanency review orders) are not the dispositional orders subsequent to adjudication, and Father is not put "out of court," they are not final orders. We, therefore, turn to whether the orders are otherwise appealable.

An appeal may additionally be taken from an interlocutory order appealable by right or permission, or a collateral order. ***See*** Pa.R.A.P. 311, 312, 313; ***see also J.M.***, 219 A.3d at 650. As Father did not assert that the orders in question appealable by right or permission pursuant to Pa.R.A.P. 311 or 312, we examine whether they are collateral orders pursuant to Pa.R.A.P. 313. "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b); ***see also J.M.***, 219 A.3d at 655; ***see also In re J.S.C.***, 851 A.2d 189, 191 (Pa.Super. 2004). Critically, "[o]ur Supreme Court has directed that Rule 313 be interpreted narrowly so as not to swallow the general rule that only final orders are appealable as of right. To invoke the collateral order doctrine, each of the three prongs identified in the rule's definition must be clearly satisfied." ***J.M.***, 219 A.3d at 655, citing ***In re W.H.***, 25 A.3d 330, 335 (Pa.Super. 2011).

Specifically, as to the first prong, we have stated,

Regarding the first prong, "an order is separable from the main cause of action if it is 'entirely distinct from the underlying issue in the case' and if it can be resolved without an analysis of the merits of the underlying dispute.'" [**K.C. v. L.A.**, 633 Pa. 722, 728, 128 A.3d 774, 778 (2015)] (citing **Commonwealth v. Blystone**, 632 Pa. 260, 119 A.3d 306, 312 (2015)); **see also Cohen v. Beneficial Indus. Loan Corp.**, 337 U.S. 541, 546-47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ("We hold this order appealable because it is a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it."); **Barak v. Karolizki**, 196 A.3d 208, 218 (Pa. Super. 2018) (citing **Ben v. Schwartz**, 556 Pa. 475, 729 A.2d 547, 552 (1999) ("The element of separability requires that the merits of the appeal must be resolvable 'without analysis' of the substantive claims in the underlying lawsuit."). "Although [appellate courts] tolerate a degree of interrelatedness between merit issues and the question sought to be raised in the interlocutory appeal, the claim must nevertheless be conceptually distinct from the merits of plaintiff's claim." **Blystone**, 119 A.3d at 312 (citation and quotation marks omitted).

One of the complications with the collateral order doctrine as applied to dependency matters is what precisely constitutes the main cause of action. This Court has not been consistent with that determination. In [**In re Tameka M**., 534 A.2d 782 (Pa. Super. 1987)], which is a child welfare agency's appeal from an order mandating that the agency reimburse the foster parents of a dependent child for preschool tuition, an **en banc** panel of this Court offered a narrow interpretation of the main cause of action. After reviewing the purposes behind the Juvenile Act, this Court concluded that "the main cause of action consists of a dependency determination and disposition," a conclusion this Court believed was reinforced by the fact it is the

dispositional order that constitutes a final, appealable order. ***Tameka M.***, 534 A.2d at 786. . . .

***J.M.***, 219 A.3d at 655-656.

We have stated that a child must be adjudicated dependent for the trial court to have the authority to enter an order finding aggravated circumstances. ***See In the Interest of J.M.***, 166 A.3d 408, 421 (Pa.Super. 2017). This court has also held that the fact that an issue is a statutory matter to be addressed by the trial court has no bearing on what constitutes the main cause of action. ***In the Interest of J.M.***, 219 A.3d at 658 n.13.

In ***In re R.C.***, 945 A.2d 182, 184 (Pa.Super. 2008), this court stated that an appeal from an order finding aggravated circumstances is "by definition . . . an appeal as of right from a collateral [o]rder." ***See In re R.C.***, 945 A.2d at 184. In ***In re R.C.***, this court reasoned that, if we were to wait to address the finding of aggravated circumstances until a petition for involuntary termination of parental rights were filed, the appellant would consequently lose the opportunity to challenge what is likely to be the very basis for such a petition, his failure to have contact with his child for more than six months. ***Id.*** Thus, we ruled that an order finding for aggravated circumstances satisfies the second and third prongs of the collateral order test because the appellant risks losing the opportunity to appeal the order. ***See id.*** Accordingly, this court concluded that an order finding aggravated circumstances is a collateral order and is immediately appealable as of right. ***See In re R.C.***, 945 A.2d at 184. As the instant appeals stem from the orders

finding aggravated circumstances, the orders are appealable as collateral orders pursuant to Pa.R.A.P. 313.

Next, we address Father's first two issues together: whether the court erred in finding he was a perpetrator of abuse by omission as defined at 23 Pa.C.S.A. § 6303, as there is no evidence he was present when harm was caused to any or all of the Children, or that he observed or was aware of any harm being done to any or all of the Children. As the abuse alleged in the instant appeal occurred in December of 2018, the current version of the Child Protective Services Law ("CPSL"), 18 Pa.C.S.A. § 301 *et seq.*, which became immediately effective on June 12, 2018, controls our review.

Section 6303 of the CPSL defines child abuse, in relevant part, as follows:

> **(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> . . . .
>
> (5) Creating a reasonable likelihood of bodily injury to a child through any recent actor failure to act.

23 Pa.C.S.A. § 6303(b.1) (footnote omitted).

The CPSL refers to 18 Pa.C.S.A. § 302 with respect to the definitions of intentionally, knowingly, and recklessly. 18 Pa.C.S.A. § 302(b) provides as follows:

> (1) A person acts intentionally with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
> >
> > (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.
>
> (2) A person acts knowingly with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
> >
> > (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.
>
> (3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the

standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b).

Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(a).

In *In the Interest of J.R.W.*, 631 A.2d 1019, 1024 (Pa.Super. 1993), we explained that, pursuant to the doctrine of incorporation, the Juvenile Act's definition of dependent child subsumed the definition of child abuse outlined in the CPSL. Thus, we stated the two laws "must be applied together in the resolution of child abuse complaints." *Id.* at 1023. We reasoned:

> The Legislature intended a detailed and specific definition of abuse to leave no doubt as to the capacity of the trial court, which in this case can only be the Juvenile Court, to make a finding and determination that a child has been abused. In its capacity as a trial judge, the Juvenile Court judge will look and must look to the above definition of child abuse in a case referred by the child protective service agency to the Court under petition for review of dependency when child abuse has been alleged.

*Id.*

The *prima facie* evidence rule set forth in the CPSL, 23 Pa.C.S.A. § 6381, provides, in part:

> **(d)** **Prima facie evidence of abuse.--**Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381.

The panel in *J.R.W.* indicated that the trial court correctly determined that a finding of child abuse must be supported by clear and convincing evidence, as the Legislature imposed such standard for the trial court to apply in deciding abuse cases. *J.R.W.*, 631 A.2d at 1025. Although the *prima facie* evidence rule imposes a lesser standard to determine the identity of the abuser, "[t]here is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the [Juvenile] Act to establish child abuse. *Id.* at 1024; *see also In re L.Z.*, 631 A.3d at 361, 111 A.3d at 1174.

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (citation omitted).

The Juvenile Act at 42 Pa.C.S.A. § 6302, in part, defines "Aggravated circumstances" as:

> Any of the following circumstances:
>
> . . . .
>
> (2)  The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by a parent.

. . . .

42 Pa.C.S.A. § 6302. In turn, Section 6302 defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.* Further, Section 6302 defines "aggravated physical neglect" as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

Regarding aggravated circumstances, 42 Pa.C.S.A. § 6341(c.1) provides:

> **(c.1) Aggravated circumstances.--**If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1).

Moreover, as we stated in *In re R.P.*, 957 A.2d 1205 (Pa.Super. 2008),

> The court need not find the existence of aggravated circumstances as to a particular party; rather, it merely must determine whether they are present in the case. This is so, as noted *supra*, because the

focus is not on the rights of the [p]arents; instead, the children's safety, permanence, and well-being take precedence.

*Id.* at 1219 (citation omitted).

In the present appeal, in finding the Children were the victims of child abuse, the trial court reasoned:

Section 6303 defines "perpetrator" as "a person who has committed child abuse" which is defined as "intentionally, knowingly or recklessly . . . causing bodily injury to a child through any recent act or failure to act" or "creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act." 23 Pa.C.S.A. § 6303(a); 23 Pa.C.S.A. § 6303(b.1)(1) and (5). Finally, "aggravated circumstances" include when "the child . . . has been the victim of physical abuse resulting in serious bodily injury, sexual violence, or aggravated physical neglect by the parent." 42 Pa.C.S.A. § 6302.

During the February 18, 2020 hearing, the [m]other of the child, who had nothing to gain from her testimony, testified that Father either caused the [Children's] bodily injuries or at the very least was aware of and saw the [Children's] bodily injuries, particularly extensive bruising, and failed to act upon that knowledge. *See* February 18, 2020 Transcript at pages 95-107. The [Children's] bodily injuries were so severe the doctors that examined the child could not catalog them in accordance with their standard practice. *See* February 27, 2019 Transcript at page 79, line 3 through page 80, line 13. The [m]other testified the [f]ather was present and saw the [Children] during the period the injuries occurred. *See* February 18, 2020 Transcript at page 96, lines 3-11. The [trial c]ourt specifically addresses its findings of fact and analysis at pages 117-119 of the February 18, 2020 hearing transcript.

The [c]ourt's Aggravated Circumstances Order and the hearing transcript of February 18, 2020, which is

> considered the Opinion of the Court in support of said Order, should be affirmed and Father's appeal denied. The Order and transcript provide a comprehensive analysis of the [c]ourt's decisions and findings of fact, and are supported by the testimony from the hearing held on February 18, 2020, particularly the [m]other's testimony. This [c]ourt will rely on the transcript and Order for this appeal.

Trial court opinion, 3/27/20 at 1-3.

After our careful review, we find that there was clear and convincing evidence in the record to support the trial court's finding of the existence of aggravated circumstances and that Father was a perpetrator of abuse by omission on the Children, who had previously been ruled victims of child abuse. *See* 23 Pa.C.S.A. § 6303(b.1); 23 Pa.C.S.A. § 6381; 42 Pa.C.S.A. § 6302; 42 Pa.C.S.A. § 6341(c.1).

We are not persuaded by Father's contention that the trial court erred in concluding that Mother was credible and had nothing to gain by her testimony, and in giving her testimony more credibility and weight than his own testimony. We find it worthy of note that, in the previous dependency proceeding before Judge McCoy that led to aggravated circumstances orders against Father, Judge McCoy added that, although she suspected that Father might have caused serious bodily injury to D.D.3, the court did not find such proven at the hearings. (Orders, 3/25/19 at 3 (unpaginated), *supra*.) Moreover, Judge McCoy found that, in light of the photographs that showed the condition of the Children in the home on December 20, 2018, it was unlikely that the conditions occurred after Father's last time in the home

approximately three weeks prior, and that Father was unaware of what was going on in his home. (***See*** Orders, 3/25/19 at 3 (unpaginated).)

Likewise, we find Father's contention that Mother's testimony at the February 18, 2020 hearing was not credible and was biased against him, and should not have been afforded any weight, lacks merit. In relation to the October 8, 2019 CPS reports that were before the trial court, Judge Tira indicated that he found Mother's testimony to be very honest and very telling. (Notes of testimony, 2/18/20 at 117-119.) Judge Tira found that, although Father presented to the court as a loving father, Father would have been "hands-on" with the Children in the past, and, at the least, would have known that they had bruises and injuries. (***Id.***) Thus, significantly, both of the trial court judges who heard the testimony concerning the injuries of the Children believed that Father had more knowledge and involvement in the abuse of the Children than he admitted in court, but found that there was insufficient evidence upon which to conclude that he committed the abuse acts that caused serious bodily injuries to the Children.

Given the evidence, the trial court's factual findings and determination that Father was not credible in asserting that he knew nothing about the abuse because he was not present when it was committed, and did not observe it and was unaware of it, are supported by the clear and convincing, competent evidence in the record. Thus, we will not disturb the trial court's findings of fact and credibility assessments. ***In re R.J.T.***, 9 A.3d at 1190; ***see also***

***In re L.Z.***, 111 A.3d at 1174. Moreover, as the trial court's rejection of Father's claims that he was not a perpetrator of abuse of the Children by omission because he was not present for any abuse, nor did not observe nor was he aware of any abuse, is supported by the clear and convincing evidence in the record, the trial court did not abuse its discretion in finding the existence of aggravated circumstances as to Father. ***Id.***; 42 Pa.C.S.A. § 6341(c.1). We discern no abuse of the trial court's discretion in finding that Father was the perpetrator by omission of abuse on the Children, who were previously ruled to be victims of child abuse.

Accordingly, we affirm the February 18, 2020 orders, and the contemporaneous findings of the existence of aggravated circumstances.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/4/2020